

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-09-00067-CV
_____


IN THE INTEREST OF K.L.L.H. AND T.J.A., MINOR CHILDREN


On Appeal from the 307th Judicial District Court
Gregg County, Texas
Trial Court No. 2008-1809-DR


Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Justice Moseley

MEMORANDUM OPINION

Tamera Allison appeals from the termination of her parental rights to K.L.L.H. and T.J.A., minor children, after suit was brought by the Texas Department of Family and Protective Services (DFPS). She claims that her counsel's performance was ineffective and that the trial court committed "structural error" in appointing counsel too late. Allison also argues on appeal that Section 107.013 of the Texas Family Code, which requires the trial court to appoint an attorney ad litem for indigent parents, is unconstitutional as applied to her case because it does not contain a time frame in which counsel was to be appointed. We affirm the trial court's judgment terminating Allison's parental rights.

## I.     An Eventful Day Leads to a Parental Termination Suit

Allison and her three children (T.K.A., T.J.A., and K.L.L.H.) shared a two-bedroom apartment with Allison's mother, her brother (Danterio), and her sister (Summer). After an August 16, 2008, noontime telephone call from a bill collector awoke Allison from her slumber, she went onto the porch of the apartment to smoke either a cigarette or a marihuana blunt. While she was there, her mother and Danterio arrived. Danterio notified Allison that one of her children was crying. Entering the bedroom where her three sons had been sleeping, Allison discovered thirteen-month-old T.J.A. atop of his twin brother, T.K.A. Allison picked T.K.A. up and realized something was wrong because he "was cold to the touch, had a blank face[,] . . . was slightly discolored," had a "snot-like substance on his nose," and blue lips. An emergency 9-1-1 call was

placed and T.K.A. was taken to the hospital emergency room, where he was pronounced dead on arrival. Although the child was found to have elevated levels of alcohol in his system, the cause and manner of death was listed as undetermined.[1]

Later in the day, the surviving twin, T.J.A., was dropped off at his paternal grandmother's home. The grandmother noticed that T.J.A. had a diaper rash with redness and blisters, a distended abdomen, and red and swollen feet. The grandmother took T.J.A. to the same emergency room where his brother had been taken earlier in the day and the child was given treatment for significant diaper rash and stomach pain. According to hospital staff, T.J.A.'s "swollen belly might have been a result of sucking in a lot of air from crying." They noticed that T.J.A. appeared very hungry, and drank "contrast fluid, which is not tasty."

A DFPS worker "received an intake alleging neglectful supervision" concerning T.J.A. and went to the hospital to interview Allison. Allison was able to "discuss the events of the day and her child's death without expressing grief or sorrow through tears." She laughed and played with T.J.A. while waiting in the hospital, a behavior that seemed strange to the DFPS worker, given the facts of the day. When questioned about her children, Allison stated they ate three times a day "if" they had food. Allison related that the children had all shared a can of Vienna sausage, Ramen noodles baked on a baking sheet, and "a half a pack of crackers" the night before. She went on to say that she also

_____

[1]The autopsy report states, "The laboratory did reveal non-lethal levels of Isopropanol and acetone. . . . the origin of the Isopropanol has not been determined. It most likely was a contributing factor in the death of this child."

3

had given the twin babies a bottle of tea at 1:00 a.m., but did not indicate she had fed them until after noon the following day. She was not sure if they had active Medicaid and admitted that she had not gotten all of the recommended immunizations. In fact, neither of the twin boys had been seen by a doctor since they were one month of age and had been given no immunizations after birth. Allison clarified she did not have a job and relied on three-year-old K.L.L.H.'s paternal grandmother for the children's food and clothing. At the conclusion of the interview, T.J.A. left the hospital with DFPS.

## II.     The Termination Proceeding

DFPS filed a petition on August 18, 2008, seeking termination of Allison's parental rights to T.J.A. and K.L.L.H., alleging that Allison (1) had knowingly placed or allowed the children to remain in conditions or with people who endangered their physical or emotional well being, (2) had failed to comply with the court-ordered family plan, and (3) was unable to provide the children with a safe environment. Additionally, the petition alleged Allison constructively abandoned the children because she neither maintained significant contact with them, nor did she favorably respond to DFPS's reasonable efforts to return the children to her.

The trial court appointed DFPS temporary sole managing conservator of the children the day the petition was filed, and noted that the appointment of an attorney ad litem to represent Allison would be mandatory if she was indigent. Allison was ordered to appear at the adversary hearing on August 28 with all pertinent information regarding income in order to determine whether she was indigent. Allison appeared pro se at the hearing and agreed to the entry of an order containing a

4

service plan. Allison was required to pay child support for the children of $252.38 per week, undergo psychological evaluation, and was to attend counseling, parenting, and drug and alcohol classes. The agreed order required her to maintain weekly contact with DFPS caseworker Cherie Eisenring, maintain stable employment, make herself available for drug screens, and "maintain appropriate housing for a minimum of 6 months and demonstrate an ability to keep the home free of hazards," with working utilities. Prior to concluding the hearing, a DFPS representative told the court that she had "discussed with Ms. Allison [that she needed to fill] out an application to request legal counsel. I don't believe she has filled one out yet." The trial court instructed Allison to obtain forms regarding indigency from the bailiff before she left the courtroom. No such filled-out forms appear in the record.

Allison completed only two parenting classes. Her first visitation with the children did not occur until September 24, 2008. When asked to describe the visit, Eisenring stated, "Throughout the visit she would raise her hand at [T.J.A.] like she was going to hit him."

> [T.J.A.] basically through that first visit was kind of left by himself in that room. He was left on the couch by himself and he almost fell off the couch. [Allison] just sat and watched a movie that she put in. There was really no interaction between her and her children. She had an attitude the whole time. She kept yelling at . . . Summer's son, throughout the whole visit.
>
> . . . .
>
> She was telling him to shut up and just really aggressive with him . . . throughout the visit, she kept telling [T.J.A.] that he is bad throughout the time of that visit. And then [T.J.A.] hit [K.L.L.H.] in the head, she didn't correct the behavior. And then throughout the visit, too, [K.L.L.H.] had asked where his mama

5

was, which I thought was kind of disturbing, and [Allison] said, "I'm your mama."
And he asked again where his mama was.

Eisenring recalled that "[t]here wasn't a real bond from what I observed in that visit." Although she was scheduled for a counseling session, Allison was unable to attend because she was arrested and incarcerated on September 28, 2008, for aggravated assault charges.[2] No other task or service in the agreed plan was completed by Allison.

On January 16, 2009, Eisenring visited with Allison in jail. Allison acted angry and hostile, "kept making fists, and charging the glass as to intimidate . . . and was not willing to work with the caseworker." She "stated she didn't want a court appointed attorney even though the caseworker told her about one." Allison told Eisenring that "court attorneys are a joke and [she] would be getting one when she got out." Allison refused to cooperate with Eisenring's attempt to help her request a court-appointed attorney.

Once again and still incarcerated, Allison failed to appear at the permanency hearing held on February 25, 2009. DFPS stated, "Ms. Eisenring went to the jail last week . . . and . . . was trying to suggest that [Allison] get a lawyer, and she cursed at the thought that she would take a court-appointed lawyer in this case." At the hearing, a DFPS employee reported that Allison had not

---

[2]An incident report said Allison's "friend and her baby, they were walking across the street, [Allison] came out with . . . a steel pole and hit this friend; she just started swinging and hit her twice in the left arm and once in the back of the head." As a result of the incident, Allison was incarcerated for two years.

completed any task or service due to her incarceration, and it was found that she had not demonstrated adequate and appropriate compliance with the service plan.

Despite the fact that Allison never filed a declaration of indigence, on May 27, 2009, the trial court appointed Mike Lewis as her attorney ad litem and scheduled trial on June 22, 2009. Allison appeared through Lewis at a June 2, 2009, permanency hearing where the court again found she was not complying with the service plan. The trial court made the following notation: "We -- for the record, I believe we tried to have [Allison] brought down one day last week to see if she -- to get on the record whether she wanted to have an attorney -- I think she had indicated to the caseworker she didn't." The court instructed Lewis to let it know if Allison refused his help. On June 12, 2009, Allison signed a letter addressed to the court on Lewis' letterhead stating, "I, Tamera Allison do not wish to have appointed representation in Cause No. 2008-1809-DR. I understand that this does not prevent me from representing myself." Allison appeared via telephone at trial. She immediately told the trial court that although she signed the letter indicating she wanted to represent herself, she had changed her mind almost at once thereafter and that she wanted Lewis to represent her. Lewis was summoned, and the trial resumed.

Professional counselor Donna Mason testified that K.L.L.H. exhibited aggressive behavior apparently learned from adults, including hitting, crying, screaming, and saying, "I don't care, I'm going to kill you." K.L.L.H. had stated that while Danterio was watching him, he "hit me with a belt, he hit me on my butt and on my wee wee." For the majority of his life, K.L.L.H., "lived and

7

he stayed with [his paternal grandmother] at least two or three weeks at a time," and would then return to his mother's apartment. K.L.L.H.'s aggressive behavior had significantly improved since he was left in his paternal grandmother's care, and he had received the twenty-two immunization shots he had missed while in Allison's custody.

Next, Eisenring reported that T.J.A. had folliculitis sores on his head while under the watch of Allison that would cause his scalp to bleed; Allison had refused to cut the thirteen-month-old's braided hair. T.J.A. was also developmentally deficient. He could not speak, hold a spoon, eat from a plate, was not walking, and had "horrible" sleeping patterns which resulted in him banging his head against the pillow for hours. These problems, along with his aggressive behavior and lack of proper immunizations, were remedied when placed in a foster home. Eisenring told the court that Summer, who was often left to care for the children, was now incarcerated for injuring her own child by hitting him in the face with a belt and buckle.

At the conclusion of the testimony, the trial court found, by clear and convincing evidence, that Allison failed to comply with court orders and service plans and that the children were physically or emotionally endangered while in Allison's care. Allison's parental rights to T.J.A. and K.L.L.H. were terminated.

## III.    Allison Waived the Argument that Section 107.013 Is Unconstitutional

Allison raises the following point of error: "Section 107.013(a)(1), (c) is unconstitutional as applied to Allison because it does not specify a time by which counsel must be appointed;

therefore, it operated to deprive her of due process right to counsel and fair trial." Judicial economy requires that a trial court have the opportunity to correct an error before an appeal proceeds. *In re C.O.S.*, 988 S.W.2d 760, 765 (Tex. 1999). To preserve error for appellate review, Allison was required to make a timely objection specifying the grounds for the objection at the earliest opportunity and obtain an adverse ruling from the trial court. *See* TEX. R. APP. P. 33.1(a)(1). In parental rights termination cases, "a party who intends to request a new trial or appeal the order must file with the trial court: (1) a request for a new trial; or (2) if an appeal is sought, a statement of the point or points on which the party intends to appeal." TEX. FAM. CODE ANN. § 263.405(b) (Vernon 2008). "The appellate court may not consider any issue that was not specifically presented to the trial court in a timely filed statement of the points on which the party intends to appeal or in a statement combined with a motion for new trial." TEX. FAM. CODE ANN. § 263.405(i) (Vernon 2008). Even constitutional challenges can be waived by failure to object. *Curry v. State*, 910 S.W.2d 490, 496 (Tex. Crim. App. 1995). "Except for complaints involving systemic (or absolute) requirements, or rights that are waivable only, . . . all other complaints, whether constitutional, statutory, or otherwise, are forfeited by failure to comply with Rule 33.1(a)." *Mendez v. State*, 138 S.W.3d 334, 342 (Tex. Crim. App. 2004).

Allison did not file a motion for new trial. Her statement of points discusses the alleged unconstitutionality of Section 263.405 of the Texas Family Code, not Section 107.013. Therefore, we find that Allison waived the first point of error. It is overruled.

9

**IV.    Allison Was Not Deprived of Alleged Right to Timely Appointment of Counsel**

Allison's next complaint can be fairly summarized as follows: "[t]he state must comply with procedural due process requirements," "[t]he Texas Family Code requires appointment of an attorney ad litem to represent indigent parents," "[d]enial of right to counsel in the criminal context is a structural defect," structural defects "defy analysis by 'harmless error' standards," "[t]he trial court waited too late . . . to appoint an attorney" and therefore, "[f]ailure to timely appoint an attorney denied Allison the right to meaningful participation" because "[t]he attorney ad litem's performance was so egregious that it constituted deprivation of the right to counsel."  First, we note that although Allison repeatedly refused the proffer of court-appointed counsel and had never filed the statutorily-required document which would authorize the trial court to appoint an attorney ad litem for her, she was in fact appointed counsel.  This leaves only the argument that counsel was appointed too late.

In a termination proceeding, a trial court has discretion not to appoint counsel until after a parent has requested appointment. *In re J.R.P.*, 55 S.W.3d 147, 150–51 (Tex. App.—Corpus Christi 2001, pet. denied); *In re M.J.M.L.*, 31 S.W.3d 347, 355–56 (Tex. App.—San Antonio 2000, pet. denied) (holding record devoid of evidence that parent was denied reasonable access to counsel where he had only conferred with him for one and a half hours prior to trial). Section 107.013 of the Texas Family Code states that "[a] parent who claims indigence . . . must file an affidavit of indigence in accordance with Rule 145(b) of the Texas Rules of Civil Procedure before the court can conduct a hearing to determine the parent's indigence under this section." TEX. FAM. CODE ANN.

10

§ 107.013(d) (Vernon 2008). Because Allison failed to file an indigency affidavit (the act which would trigger the process for mandatory appointment of an attorney ad litem for her), the trial court's appointment of counsel can be described as generous.[3] We conclude that under the circumstances here, the trial court did not abuse its discretion in waiting to appoint counsel until May 27, 2009.[4]

## V.     Allison Was Not Denied Right to Effective Assistance of Counsel

Allison alleges her attorney was ineffective because he (1) failed to file an answer; (2) did not request a bench warrant to bring Allison to court for the trial; (3) did not interview potential witnesses other than the grandmother; (4) failed to file a motion to withdraw; (5) made no request for a continuance before trial on the merits; (6) cross-examined only three of the six witnesses; (7) neither called any witnesses, nor presented any evidence on Allison's behalf; (8) did not object to the introduction of T.K.A.'s autopsy report; and (9) misstated the burden of proof in closing

---

[3]A sister court has held that when a parent refuses appointed counsel and indicates intent to hire an attorney, they are no longer considered indigent. *See Thornton v. Tex. Dep't of Protective & Regulatory Servs.*, No. 03-01-00317-CV, 2002 WL 246408, at *2 (Tex. App.—Austin Feb. 22, 2002, pet. denied) (not designated for publication). That case held that appointment of counsel less than two months before trial did not violate the parent's right to counsel. *See also M.J.M.L.*, 31 S.W.3d at 356 (no violation of due process rights from delay in appointing counsel where parent did not request counsel). We do not address whether this appointment in the absence of the filing of an indigency affidavit would be an ultra vires act.

[4]Allison also cited caselaw pertaining to the Federal Constitution in her brief. We note that the Federal Constitution does not require that counsel be appointed for all indigents faced with termination of their parental rights. *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 27–32 (1981). Rather, the trial court must weigh the parent's interests, the State's interests, and the risk of an erroneous decision without counsel. *Id.*

argument to the trial court.  Although not raised in the statement of points, we consider Allison's

ineffective assistance of counsel claim.  *In re J.O.A.*, 283 S.W.3d 336, 339 (Tex. 2009) (TEX. FAM.

CODE ANN. § 263.405(i) ruled unconstitutional to the extent that it prevents appellate consideration

of parent's ineffective assistance of counsel claim in the absence of inclusion of that claim among

points of error.).

The "statutory right to counsel in parental-rights termination cases embodies the right to

effective counsel."  *In re M.S.*, 115 S.W.3d 534, 544 (Tex. 2003).  The two-pronged analysis

employed in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), is also used in termination cases.

*J.O.A.*, 283 S.W.3d at 341; *M.S.*, 115 S.W.3d at 545.  Both prongs of the *Strickland* test must be

established in order to establish ineffective assistance.  *M.S.*, 115 S.W.3d at 545.

First, Allison must show that counsel's deficient performance resulted in "errors so serious

that counsel was not functioning as the 'counsel' guaranteed" to her by the Sixth Amendment.  *Id*.

In analyzing this prong, we take into account all circumstances surrounding the case and primarily

focus on whether counsel performed in a reasonably effective manner.  *Id.*  We also "give great

deference to counsel's performance, indulging 'a strong presumption that counsel's conduct falls

within the wide range of reasonable professional assistance,' including the possibility that counsel's

actions are strategic."  *Id.*  Only when counsel's conduct is "so outrageous that no competent attorney

would have engaged in it," will the challenged conduct constitute ineffective assistance.  *Id.*  Also,

allegations of ineffectiveness must be firmly founded in the record.  *Thompson v. State*, 9 S.W.3d

808, 813 (Tex. Crim. App. 1999); *In re T.N.F.*, 191 S.W.3d 329, 330 (Tex. App.—Waco 2006, order). We will not speculate to find trial counsel ineffective when the record is silent on counsel's reasoning or strategy. *Robinson v. State*, 16 S.W.3d 808, 813 n.7 (Tex. Crim. App. 2000); *In re M.C.T.*, 250 S.W.3d 161, 172 (Tex. App.—Fort Worth 2008, no pet.). Where, as here, the record is silent as to the reason that counsel failed to lodge certain objections or take certain actions, we assume it was due to any strategic motivation that can be imagined and, in order to succeed in her complaint, Allison is obligated to rebut the presumption that trial counsel's actions were in some way reasonable. *Mata v. State*, 226 S.W.3d 425, 431 (Tex. Crim. App. 2007).

Addressing this first *Strickland* prong, we dispose of several alleged points of ineffectiveness. First, since the matter was set for trial, and Allison had already appeared in the lawsuit, counsel could have determined that no written answer was required. Had an answer been filed, it would not alter the burden of DFPS to prove the allegations contained in its petition by clear and convincing evidence or otherwise have provided any benefit to Allison she would otherwise not have had. Next, we may assume, based on Allison's reported hostile behavior throughout the termination proceedings, that counsel thought it best not to request a bench warrant simply to bring Allison before the trial court; to have done so might well have made this demonstrated hostile attitude more readily apparent to the trial court, thereby damaging Allison's case. Further, counsel's interview with the maternal grandmother could have led him to decide that it would be useless to interview

13

other witnesses, or, after reviewing DFPS's files and speaking with Allison, there were no other available witnesses who could testify in a manner that would improve her defense.

Counsel requested no continuance. Unless a court finds it is in the best interest of the children to remain in the temporary managing conservatorship of DFPS, it must commence with trial on the merits in a termination proceeding no later than "the first Monday after the first anniversary of the date the court rendered a temporary order appointing the department as temporary managing conservator." TEX. FAM. CODE ANN. § 263.401(a) (Vernon 2008). If the court fails to comply with this time line, it "shall dismiss the suit." *Id*. DFPS was appointed temporary managing conservator on August 18, 2008. Trial on the merits commenced on June 22, 2009. With only a little over two months left before expiration of the statutory deadline to dismiss the case, and nothing in the record to indicate the trial court's docket would enable it to reschedule trial within the time frame, counsel may have felt that requesting a continuance would be futile. *See In re A.A.*, No. 05-07-01698-CV, 2008 WL 2514346, at *3 (Tex. App.—Dallas June 25, 2008, no pet.) (mem. op.). Importantly, counsel's billing records indicate that he made preparation for trial; there is the possibility that he was as ready to proceed with trial as he would be later if a continuance were requested and granted. Alternatively, because Allison refused assistance of counsel and insisted on representing herself, we may assume this was the reason counsel did not request a continuance, a bench warrant, or conduct discovery to Allison's liking. Allison does not explain why the failure of counsel to file a motion

14

to withdraw was deficient performance and we need not address the alleged ground of ineffectiveness.

Additionally, Allison complains of trial counsel's failure to cross-examine T.J.A.'s foster parent, K.L.L.H.'s foster parent, and the guardian ad litem for the children. It is possible that cross-examination may not have proven useful to Allison's defense and he may have deemed that a cross-examination would have served only to emphasize points damaging to Allison's case. Allison complains that counsel did not call any witnesses or present any evidence in her defense, but fails to identify any such witnesses or suggest any other evidence that may have been helpful. Again, counsel could have decided that any potential witnesses could have caused more harm than good, or that there was no evidence favoring Allison. "Appellant refused to cooperate with counsel and did not want her representation; thus, she should not benefit from a reversal based on counsel's actions at trial." *In re R.S.*, No. 14-08-01013-CV, 2009 WL 3191515, at *5 (Tex. App.—Houston [14th Dist.] Oct. 1, 2009, pet. denied) (mem. op.). Without citing authority supporting her position, Allison complains that counsel should have objected to the properly certified autopsy report because it "contained hearsay, the author of the autopsy was not present, and counsel had not read the report or even seen it before that day." Allison fails to bring to this Court's attention any portion of the report which contains hearsay. Further, counsel could have decided the autopsy report was more helpful than harmful to Allison because it stated T.K.A. was well nourished, well developed, had no fractures, and was otherwise inconclusive as to the cause of death. Finally, although counsel stated

DFPS's burden of proof was by a preponderance, rather than by clear and convincing evidence, the comment was made during a bench trial to a judge who knew the burden of proof and there is no indication that the trial judge was prompted to rely on a lesser burden than the law requires. We look to counsel's performance as a whole, and find this isolated incident was not so serious that we must find his performance deficient.

Even assuming alleged deficiency with respect to any of the grounds of ineffectiveness, under the second prong of *Strickland*, Allison cannot demonstrate that counsel's performance caused harm or otherwise prejudiced her such that it prevented a fair trial. *M.S.*, 115 S.W.3d at 545. Counsel's representation must be "so grossly deficient as to render proceedings fundamentally unfair." *Id.* In other words, Allison had to show "there is a reasonable probability that, but for counsel's unprofessional error(s), the result of the proceeding would have been different." *Id.* at 550. We conduct the review "to determine harm as if . . . sufficiency had been preserved . . . understanding that the evidentiary burden in such cases is 'clear and convincing.'" *Id.*; *see* TEX. FAM. CODE ANN. § 161.001(1) (Vernon Supp. 2009). Clear and convincing evidence is "proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *J.O.A.*, 283 S.W.3d at 344.

"The distinction between legal and factual sufficiency when the burden of proof is clear and convincing evidence may be a fine one." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). When conducting a legal sufficiency review, and giving appropriate deference to the trial judge in this case,

16

we "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *J.O.A.*, 283 S.W.3d at 344 (citing *J.F.C.*, 96 S.W.3d at 266). We assume the trial court resolved disputed facts in favor of its finding, and disregard evidence which could have been found to be incredible. *Id.* "If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* (citing *J.F.C.*, 96 S.W.3d at 267).

Here, DFPS had to prove by clear and convincing evidence that Allison: (1) "failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child[ren]"; (2) "knowingly placed or knowingly allowed the child[ren] to remain in conditions or surroundings which endanger[ed] the[ir] physical or emotional well-being"; or (3) constructively abandoned the children if they "ha[d] been in the permanent or temporary managing conservatorship of [DFPS] . . . for not less than six months," even though DFPS made reasonable efforts to return the children. TEX. FAM. CODE ANN. § 161.001(1)(D), (N), (O). This occurred if Allison did not regularly visit them, or demonstrated an inability to provide them with a safe environment. *Id.*

The evidence demonstrated that while Allison attended two parenting sessions, she failed to pay child support for the children, undergo psychological evaluation, attend counseling and drug and

17

alcohol classes, or maintain stable employment as she had been ordered. The trial court could have concluded that the DFPS had established clear and convincing evidence that Allison did not comply with the court orders. Further, the record demonstrated that DFPS was temporary managing conservator of the children for well over six months, that Allison visited the children only once prior to her incarceration, and that she was unable to provide them with a safe environment. Thus, constructive abandonment was also established by clear and convincing evidence. Finally, evidence that Summer had gone to jail for injuring her son, that Danterio had hit K.L.L.H. with a belt, that alcohol was in T.K.A.'s system when he passed away, that the children were not provided proper medical treatment or care, did not have normal sleeping patterns, were developmentally challenged, and did not maintain a proper diet could lead to an indication that Allison either "knowingly placed or knowingly allowed the child[ren] to remain in conditions or surroundings which endanger[ed] the[ir] physical or emotional well-being." Thus, Allison would not be able to meet the second *Strickland* prong to prove that but for counsel's alleged error, the result of the trial would have been different. Our ruling is bolstered by absence of any mention in Allison's brief of evidence which counsel could have unearthed and presented to the trial court that would result in a different outcome at trial.

We conclude that Allison cannot meet her burden to demonstrate she was provided ineffective assistance under the *Strickland* test. Her last point of error is overruled.

18

**VI.    Conclusion**

We affirm the judgment of the trial court terminating Allison's parental rights to K.L.L.H. and T.J.A.

Bailey C. Moseley
Justice

Date Submitted:    December 16, 2009
Date Decided:      January 12, 2010

19